Filed 11/20/14  In re Reuben G. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re REUBEN G., et al., Persons Coming Under the Juvenile Court Law. | B255027 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK67583) |
| Plaintiff and Respondent, | |
| v. | |
| DAISY G., | |
| Defendant and Appellant. | |

APPEAL from judgment and orders of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Reversed in part and dismissed as moot in part.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Richard D. Weiss, Acting County Counsel, Dawyn Harrison, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Respondent.

Daisy G. (mother) appeals from the juvenile court's orders sustaining the jurisdictional findings against her and removing her infant son. Mother also appeals from the court's concurrent order at a six-month review hearing denying the return to her custody of her five older children. Mother contends there was insufficient evidence of risk to her infant based on past domestic violence involving the child's deceased father and the mother's past marijuana use. She also contends there was no substantial evidence showing detriment to her five older children if they were returned to her care. Lastly, mother argues that the Department of Children and Family Services (Department) failed to provide adequate notice under the Indian Child Welfare Act (ICWA) and the Department concedes this point. We agree with mother on all grounds and reverse.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Petition Regarding the Five Older Children*

When this case began in early 2013, mother and Reuben G. (father) had five children together: Reuben Jr. (Reuben), age 13; Sharon, age 9; R., age 6; Ro., age 3; and Y., age 1. On March 1, 2013, the Department received a referral indicating that mother had physically abused Y. A social worker from the Department interviewed the family later that day. The social worker observed a "fresh unexplained belt mark" on Ro.'s back, and two of the children reported incidents of domestic violence. R. said she had seen "father hit their mother with his hand on the face and then thr[o]w the mother's

---

[1] However, as noted below, a portion of this appeal is moot and, therefore, we dismiss that portion.

back[]pack, hitting the mother on the forehead . . . . " Sharon said "she is scared of father because [he] might hit her mother again." Reuben said his parents argued, but denied witnessing any physical fighting. Mother said father threw a backpack during an argument and it "landed on the ground." Ro. and Y. were too young to give a meaningful statement.

On March 7, 2013, the Department filed a petition alleging the children were endangered by the parents' history of domestic violence and father's history of abuse of alcohol and marijuana.[2] The record does not reveal why the Department chose not to pursue the referring party's allegation that mother physically abused Y. The court detained all of the children in shelter care.

On April 3, 2013, the Department filed a first amended petition adding allegations that father physically abused Ro. by striking him with a belt, mother had a history of abuse of marijuana, and mother had "mental and emotional problems" that rendered her incapable of providing regular care for the children. In the Jurisdiction/Disposition Report, the Department stated that the three older children all denied that mother used drugs, or that she had any mental or emotional problems. The

---

[2]     There were also two prior dependency cases involving the family. In March 2007, the court sustained a petition based on the parents' history of physical and verbal altercations in the presence of the children, which included an incident where father had slapped mother. Family reunification services were provided, and jurisdiction was eventually terminated. In October 2009, the Department found allegations of neglect against the parents to be substantiated after a social worker visited the family home and discovered "mold in the bathroom, . . . entertainment centers piled . . . that could . . . fall over, a motorcycle covered with a plastic sheet in the living room, . . . multipl[e] carpets that could cause someone to trip," and holes in the wall that were "stuffed with plastic bags." The parents agreed to cooperate with a Voluntary Family Maintenance Agreement and the Department terminated services in August 2010.

3

two younger children were still unable to give a meaningful statement. Mother acknowledged that she had used marijuana in December 2012 but claimed that she no longer used marijuana due to her current pregnancy.

Mother submitted to a drug test on March 20, 2013, and tested positive for marijuana. On April 4, 2013, she did not appear for a random drug test. On April 24, 2013, the court sustained the allegations of the domestic violence, father's physical abuse of Ro., and mother and father's substance abuse. The court struck the allegation that mother suffered from mental and emotional problems but ordered mother to participate in an Evidence Code section 730[3] evaluation. The court removed the children from their parents' custody and allowed the parents monitored visits at least twice a week. The court also ordered mother to (1) submit to random drug testing as well as a drug treatment program should she miss any tests or test positive, (2) participate in a domestic violence program for victims, (3) take a parenting class, and (4) do individual counseling. A six-month review hearing was set for October 22, 2013.

2. *The Petition Regarding Royal*

Father was shot and killed on April 29, 2013. In May 2013, two psychiatrists evaluated mother pursuant to the court's order and concluded that her only mental health diagnosis was a "state of bereavement due to her husband's killing." The

---

[3]    Evidence Code section 730 provides that "[w]hen it appears to the court . . . that expert evidence is or may be required by the court . . . the court on its own motion . . . may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert . . . . "

psychiatrists also indicated that mother had addressed the allegations of domestic violence during her evaluation; mother acknowledged that father had slapped her once and claimed that father had only thrown a backpack at her by accident. In June 2013, mother enrolled in a drug treatment program,[4] parenting classes and individual counseling. In June, July and August 2013, mother drug tested negative. On August 12, 2013, the Department reported that although mother "denied" that Ro. needed a "developmental assessment," she had signed an authorization for such an assessment.

On August 15, 2013, mother gave birth to a baby boy, Royal G.[5] On August 22, 2013, the Department filed a petition alleging under Welfare and Institutions Code[6] section 300, subdivision (b), mother's abuse of marijuana endangered Royal's health and safety, and under subdivision (j), mother's failure to protect her older children from father's violent behavior and substance abuse placed Royal at risk of harm.[7] The court detained Royal but gave the Department discretion to place him with mother. The Department placed Royal with a relative. Royal's adjudication hearing was initially set

---

[4]     It is not clear from the record when an order to complete a drug treatment program was made.

[5]     The Department states that mother was a "no-show" at a random drug test on August 15, 2013; however, this was no doubt due to mother's giving birth to Royal that day.

[6]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[7]     The petition also made other allegations which were not sustained by the court and are not at issue on appeal.

5

for October 2013 but was continued approximately five months (due to the Department's failure to properly serve notice under the ICWA) during which time the infant remained out of mother's care.

On September 12, 2013, mother missed a drug test. On October 22, 2013, the Department reported that Royal was in good health, that mother visited him three times a week, and that the visits "[went] well." However, the Department recommended that Royal be removed from mother's custody because she had not "consistently participated in any services" and "had not shown an understanding" of her wrongdoing. Indeed, in conversations with mother on September 9, 2013 and earlier, mother had "indicated that she does not see anything wrong with the functioning of her family other than [the Department's] involve[ment]." The Department's conclusion that mother had not consistently participated in services was based on evidence that she had switched programs twice; however, mother had consistently participated in services at the latest program since September 16, 2013.

With respect to the five older children, the Department reported that mother "had demonstrated a dedication to visiting her children" and that mother "sits with the children, cooks for them, and engages with them" during visits. However, due to mother's failure to complete court-ordered services and her "refusal to acknowledge Ro.'s developmental delay," the Department recommended that the children not be returned home at the next review hearing. The six-month review hearing scheduled for October 22, 2013 was continued to allow the Department to re-serve notice under the ICWA.

On December 18, 2013, the Department reported the mother had "continued to participate in services" and that the Department had liberalized mother's visits to unmonitored. The Department submitted letters from a drug treatment center stating that mother had participated in a program since September 2013 that addressed substance abuse, domestic violence and parenting skills, that mother had been a "role model for the other women," that all "random test[s] . . . were negative for all drugs," and that, in individual counseling sessions, she had shown "understanding of the need for her to further improve herself" and had "acknowledge[d] her need to follow the requirements [the Department] has in place in order for her to . . . become a better parent." However, the Department recommended that none of the children be returned to mother's care.

At a December 18, 2013 hearing, minor's counsel reported that "the caretakers for Reuben and for Royal . . . have no concerns about . . . mother having unsupervised visits with those two children." The social worker had not yet talked to the relative caring for the other children about mother's visits. The Department reported that it had been "liberalizing mother's visits," and "clearly recogniz[ed] [mother] is, at this point, complying with what she needs to do and showing progress." The court granted mother unmonitored visits with the older children, and continued the adjudication and six-month review hearings to allow the Department further opportunity to comply with the ICWA.

On February 13, 2014, the Department reported that, during one visit, R. "rode on the handlebars of [] mother's bike" and, "since the initiation of [] unmonitored visits,

[] ha[d] been involved in two physical altercations." The Department continued to recommend that the older children not be returned to mother's care. The hearing set for that day was continued to allow the Department to provide notice under the ICWA.

The adjudication hearing with respect to Royal, and the six-month review hearing with respect to the five older children, were held on March 10, 2014. The Department filed a report stating that mother had completed parenting, substance abuse and domestic violence classes, and that "letters from the therapist and program director indicate that [she] was an active participant in treatment." Mother's treatment center reported that she "ha[d] been a model client and always does what is expected of her." The Department reported that since mother had had unmonitored visits with the children, (1) Reuben had accused his caregiver of "imped[ing] his visits with [] mother," had "ditched" class on one day, and had told his caregiver that his skipping class "would reflect poorly on" her, and (2) Sharon was sad because "mother paid more attention to Reuben during the visits."

At the hearing, the Department recommended that the petition's allegations concerning Royal be sustained because mother had "continued to show and exhibit the same behaviors that brought this case in initially," namely that "she had difficulty . . . functioning generally in society because she has a terrible attitude. She has a terrible attitude towards the classes that the Department has asked her to complete and . . . has repeatedly stated she doesn't get anything out of them; there's nothing wrong with her family other than [the Department]."

The court sustained the allegations that mother's substance abuse of marijuana endangered Royal under section 300, subdivision (b), and that mother's failure to protect the older children from father's domestic violence, physical abuse of Ro., and substance abuse, endangered Royal under section 300, subdivision (j). Although the court did not specifically order that Royal be removed from mother's custody, this was an oversight since the court only provided that mother continue to have unmonitored visitation with the infant.

The court then proceeded to address the six-month review of the older children's case. The Department argued that there were "safety concerns" involved in returning the children to mother's care because mother had allowed R. to ride on her bicycle handlebars.[8] In addition, the Department argued that "the caretaker has had some real concerns about the children's behavior when they come back." On these grounds, the Department argued that the children should not be returned to mother's care. The court found that "return of the children to the physical custody of the mother would create a substantial risk of detriment to their safety, protection, physical and emotional well-being . . . ."

Mother timely appealed from the orders at the hearing. At a twelve-month review hearing held on June 25, 2014, the juvenile court ordered Reuben and Sharon returned to mother's custody.

---

[8] The Department also argued that the February 13, 2014 report stated that mother "wouldn't tell the caretaker where they were going." However, this evidence was not included the Department's report.

9

## *CONTENTIONS*

Mother contends that the juvenile court's jurisdictional and dispositional orders as to Royal were not supported by substantial evidence, and that the court erred in finding that it would be detrimental to the five older children to be returned to her care. Mother also argues that the Department failed to provide proper notice under the ICWA.

## *DISCUSSION*

1. *There Was No Substantial Evidence Supporting the Court's Jurisdictional Findings as to Royal*

Mother challenges the juvenile court's jurisdictional findings that Royal was a dependent under section 300, subdivisions (b) and (j). Subdivision (b) allows the court to take jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." Subdivision (j) provides for jurisdiction when "[t]he child's sibling has been abused or neglected . . . and there is a substantial risk that the child will be abused or neglected . . . ." We review the juvenile court's jurisdictional findings for substantial evidence. (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

Mother first contends there was no substantial evidence supporting the court's finding that under section 300, subdivision (j), Royal was endangered by father's violent actions and substance abuse as father was deceased at the time of the jurisdiction hearing. The Department contends that mother minimized and denied that domestic violence had occurred, and, thus, although father was now deceased, mother still

10

presented a risk to Royal. In support of this argument, the Department cites to statements mother made in March 2013 and May 2013 in which she denied that father purposefully threw a backpack at her.[9] However, mother made those statements between ten months and a year prior to Royal's jurisdiction hearing. During the interim, mother had completed a domestic violence program and individual counseling as ordered by the court. In addition, mother's treatment program informed the court she had been an "active participant" in her classes and "a model client."

Although the Department argued at the hearing that mother had a "terrible attitude" based on her refusal to acknowledge there was something "wrong with her family," this argument was based on statements mother had made at least six months earlier. Since that time, the Department had submitted evidence to the court that mother had received uniformly positive reviews from her treatment program stating that she had shown "understanding of the need for her to further improve herself," and that the Department itself "clearly recogniz[ed] [that] [mother] is, at this point, complying with what she needs to do and showing progress."

In addition, the Department did not submit evidence to the court that mother had exhibited any behavior, in the past six months, showing she was unable or unwilling to protect her children from a third party's violent actions or substance abuse. On these grounds, there was no substantial evidence supporting the trial court's finding that "there [wa]s a substantial risk that Royal will be abused or neglected."

---

[9] The Department also cites to its April 24, 2013 report where it stated that "mother [] admits to having a domestic violence history with father [] in 2007."

With respect to the allegation that mother's abuse of marijuana presented a danger to Royal, the evidence showed that mother had completed her drug treatment program and tested negative for drugs during the prior eleven months except for one missed drug test on September 12, 2013. Nor was there ever any evidence that mother's use of marijuana affected her ability to safely parent and provide for her children: her older children denied ever witnessing mother use marijuana and there was no evidence that mother's failure to protect the children from father was connected to her marijuana usage. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 ["a parent's use of marijuana '*without more,*' does not bring a minor within the jurisdiction of the dependency court."])

While the Department acknowledges that mother consistently attended her drug treatment program and completed it with positive reviews, it contends that Royal is still at risk because mother switched treatment programs two times. This contention is not persuasive. Mother *asked* the Department's social worker whether she was permitted to switch programs and the Department said that she did not need permission and only that, if she did switch programs, this could "delay the completion of any program, which could have a b[e]aring on the Family Reunification efforts." Furthermore, although the Department argues that "mother's completion of the program did not, in and of itself, eradicate the risk her substance abuse posed to Royal," the Department was required to ground that assertion on actual evidence, and the only evidence the Department presented showed mother had taken all the steps required of her to address this problem. Lastly, the Department also argues that mother had tested positive for

12

marijuana and missed a drug test approximately a year prior to the jurisdiction hearing while she was pregnant with Royal. Although this presented a risk to Royal, it was insufficient by itself to support the sustaining of jurisdiction one year later. On these grounds, we find that the trial court's finding of jurisdiction under section 300, subdivision (b), was not supported by substantial evidence.[10]

> 2. *There Was No Substantial Evidence That Return of R., Ro. and Y. to Mother's Care Would Create A Substantial Risk of Detriment to Them*

Section 366.21, subdivision (e), governs the six-month review hearing and provides that "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . In making its determination, the court . . . shall consider the efforts or progress, or both, demonstrated by the parent [] and the extent to which he or she availed himself or herself to services provided . . . ."

"The dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible. [Citations.] When a child is removed from

---

[10] Mother also challenges the removal of Royal from her custody, however, as we find that jurisdiction over Royal was improper, we need not reach the dispositional order. Furthermore, as stated above, the court never actually made a removal order as to Royal, let alone any of the attendant factual findings required by section 361. (Section 361, subd. (d) ["The court shall state the facts on which the decision to remove the minor is based."])

13

parental custody, certain legal safeguards are applied to prevent unwarranted or arbitrary continuation of out-of-home placement. [Citations.] Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody. [Citation.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

We review the record for substantial evidence in support of the court's finding that the older children would be at substantial risk of detriment if returned to mother's custody. (*In re Yvonne W., supra,* 165 Cal.App.4th at pp. 1400-1401.) However, as Reuben and Sharon were returned to mother's custody during the pendency of this appeal, this issue is moot as to them. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) Accordingly, we only review the court's finding of detriment as to R., Ro. and Y.

Mother contends there was no substantial evidence of detriment because she had completed her entire case plan, the staff at her treatment program had spoken of her progress in positive terms, and her visits with the children went well. The court was required under section 366.21, subdivision (e), to consider these efforts by mother to avail herself of the services ordered as well as her progress in completing those services. In addition, the evidence that mother consistently visited the children and that her behavior during those visits was appropriate supported a finding that the children could be safely returned to her care.

In response, the Department argues that the evidence established that mother was "unable to [put] the children's welfare and well-being above her own" because she denied Ro. had a speech delay and allowed R. to ride on her bicycle handlebars, and

because her children "struggl[ed] with behavioral issues as her time with them became liberalized." However, this evidence was insufficient by itself to show a "*substantial risk of detriment.*" Mother did, in fact, authorize Ro. to undergo an assessment to address any possible development delays, and the Department did not present evidence as to the length of any delay mother's initial denial caused in Ro. receiving services. Furthermore, that mother allowed R. to ride on her handlebars constituted only a minor safety infraction. Lastly, although the Department presented evidence that the children experienced "behavioral issues" after mother's unmonitored visits with them, the Department did not present evidence indicating that those issues were the result of any inappropriate parenting by mother, rather than the result of the children's struggle with the uncertain transition from foster care back to mother's care.

The standard for showing detriment is "a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) Here, the Department did not meet its burden of showing that the children would be at substantial risk of detriment if returned to mother's care, and, thus, the court erred in continuing their removal from mother.

3.  *The Case Must Be Remanded for Compliance With the ICWA*

In 1978, Congress passed the ICWA (25 U.S.C. § 1901 et seq.) which is designed "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and

15

placement of such children 'in . . . homes which will reflect the unique values of Indian culture . . . . ' " (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195; see 25 U.S.C. § 1902; *Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32–36.) Among the procedural safeguards included in the ICWA is a provision for notice, which states in part: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).) The Indian status of a child need not be certain or conclusive to trigger the ICWA's notice requirements. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 471.)

The Department acknowledges that notices were not provided in accordance with the ICWA because they contained incorrect information or omitted information regarding the family's Native American heritage. The juvenile court is required to inquire about a child's "Indian status" in all dependency proceedings. (*In re W.B., Jr.* (2012) 55 Cal.4th 30, 52-53.) "Once the court has learned that a child under its jurisdiction *may* have Indian ancestry, the next step [the] ICWA typically requires is notice to the tribe or, if no tribe is identified, to the [Bureau of Indian Affairs.]" (*Id.* at p. 53; italics added.)

Here, mother and maternal relatives had tribal enrollment numbers, and mother claimed father had Cherokee heritage. None of the ICWA notices sent reflected all of this information. Accordingly, a limited remand is necessary with directions to the

16

juvenile court to ensure that the ICWA's requirements are satisfied. (See *In re Brooke C.* (2005) 127 Cal.App.4th 377, 385 [holding that orders other than the termination of parental rights may be affirmed despite lack of the ICWA notice, and the matter remanded only for the purpose of allowing the juvenile court to ensure compliance with the notice requirements]; but see *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 781 [disagreeing with *In re Brooke C.* and holding that "when there has been a lack of ICWA notice, the juvenile court's orders must be vacated because they are based on different standards than should have been applied if ICWA notice was provided and showed the child is an Indian child."])

If, after proper notice is given under the ICWA, "neither the tribe nor the Bureau of Indian Affairs has provided a determinative response within 60 days after receiving that notice, then the court may determine that the [ICWA] does not apply to the proceedings, provided that the court must reverse its determination of the inapplicability of the act and must apply it prospectively if a tribe or the Bureau of Indian Affairs subsequently confirms that the child is an Indian child." (Cal. Rules of Court, rule 5.482(d)(1).) In the alternative, if it is determined that the children *are* Indian children and that the ICWA applies to these proceedings, either the children or the parents can petition the dependency court to invalidate any prior order which violated the statute. (Cal. Rules of Court, rule 5.486(a); *In re Brooke C., supra,* 127 Cal.App.4th at pp. 385-386.)

### *DISPOSITION*

17

The judgment as to Royal and the six-month review findings as to R., Ro. and Y. are reversed. The appeal as to Reuben and Sharon is dismissed as moot. The matter is remanded for the purpose of directing the juvenile court to order the Department to comply with the notice provisions of the ICWA. If, after proper notice, a tribe claims that the children are Indian children, the juvenile court shall proceed in conformity with the ICWA, and the children or mother may petition the juvenile court to invalidate any orders that violated the ICWA. If, on the other hand, no tribe makes such claim, the prior defective notices become harmless error.

*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

LAVIN, J.[*]

WE CONCUR:

KITCHING, Acting P. J.                    ALDRICH, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.